UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 07-995(DSD/SRN)

Stephanie A. Arends,

       Plaintiff,

v.                                  **ORDER**

Extendicare Homes, Inc., d/b/a
Robbinsdale Rehabilitation and
Care Center,

       Defendant.

Jonathan G. Steinberg, Esq. and Chrastil & Steinberg, 412 Fourth Street South, Suite 1155, Minneapolis, MN 55415, counsel for plaintiff.

John D. Thompson, Esq., Leonard B. Segal, Esq. and Oberman, Thompson & Segal, One Financial Plaza, 120 South Sixth Street, Suite 850, Minneapolis, MN 55402, counsel for defendant.

This matter is before the court upon defendant Extendicare Homes, Inc.'s ("Extendicare") motion for summary judgment and plaintiff Stephanie Arends's ("Arends") appeal from the magistrate judge's December 7, 2007, order. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants in part and denies in part defendant's motion and affirms the magistrate judge's order.

**BACKGROUND**

This federal diversity action arises out of Extendicare's termination of Arends on October 6, 2006. From March 2006 until her termination, Arends typically worked the night shift at Extendicare as a Licensed Practical Nurse ("LPN") in the transitional care unit ("TCU"). On May 17, 2006, Arends and Extendicare entered a Retention Bonus Agreement ("Bonus Agreement") in which Extendicare agreed to pay Arends $2,000 after ninety days employment and $1,000 upon the completion of six months, nine months and one year of employment. (Thorman Aff. Ex. 2.) The bonus payments were contingent on Arends meeting minimum performance standards, remaining in good standing with no disciplinary or attendance issues and maintaining full-time employment. (Id.) If Arends voluntarily left Extendicare or was terminated for just cause before completing twelve months of service, the Bonus Agreement required her to reimburse Extendicare for the payments she had already received. Arends received the $2,000 bonus and the first $1,000 bonus before her termination. (Id.)

At some time before October 2006, the Director of Nursing Carol Roberts ("Roberts") was informed that Extendicare was in a roughly four-month period within which it could expect a surprise inspection from the Minnesota Department of Health. (Roberts Dep. at 83-84.) Because of the impending inspection, Roberts reviewed

a sample of charts in the TCU and determined that several were incomplete.  (Id. at 82-83.)  To ensure that Extendicare was prepared for the inspection, Roberts called Arends on October 4, 2006, and asked if she would work the night shift to review patient charts and complete paperwork.  (Arends Aff. ¶ 2; Def. Ex. 25.) Tamara Williams, another Extendicare employee, was present and overheard the conversation.  Arends agreed to work the shift and requested that Roberts provide written instructions for the assignment.  When Arends arrived for the night shift she found the following instructions:

> Stephanie Arends LPN is to go thru [sic] each chart, starting at the recent admits and complete assessments and care plans (make notations applicable to each resident and sign each care plan.)  Stephanie IS NOT to do any patient care (except an emergency).  Write down charts completed at end of shift give to [Director of Nursing].

(Pl. Ex. B.)

Shortly after beginning her review of the charts, another LPN in the TCU, Jonnie Kracklew ("Kracklew"), provided Arends with a document from the Minnesota Board of Nursing entitled "FAQ: Nursing Assessment and Care Planning" ("FAQ").  (Pl. Ex. E.)  Citing Minnesota Statutes § 148.171, subdiv. 14, the FAQ stated that the "legal definition of the practice of practical nursing does not include assessment."  The FAQ further provided that:

> [t]he assessment, care planning, and evaluating functions lie within the [registered nurse ("RN")] definition and scope

3

of practice.  Therefore, it is the RN who is
responsible for writing and updating the care
plan.  The LPN contributes to the development
of the care plan by reporting pertinent
observations and suggesting nursing
intervention modifications based on client
responses.  Because the evaluation phase
includes ongoing reassessment of the client,
with appropriate revisions in the plan of
care, the LPN participates by observing and
reporting the client's response to nursing
actions to the RN.  The RN revises the plan as
is appropriate to meet the changing needs of
the client.

(Id.)[1]

Upon receipt of the FAQ,[2] Arends immediately stopped working
on the charts and consulted two senior LPNs on different floors.[3]
Both LPNs opined that Arends's assignment exceeded the proper scope
of a LPN's job duties.  Kracklew and the two other LPNs also agreed
that Arends should write Roberts a note seeking clarification of
the assignment and, because she was directed not to do patient care

---

[1] The record reflects that Roberts was aware of the FAQ,
contacted the Minnesota Department of Health about it and held a
meeting discussing it with members of the nursing staff within a
matter of weeks before giving Arends the October 4 assignment.
(See Roberts Dep. at 34-48; Amos Aff. ¶ 3.)

[2] Arends testified that she had seen the FAQ before at another
job but did not realize the documents were the same until
someone pointed it out at a later date.  (Arends Dep. at 116.)

[3] According to the Assistant Administrator for Extendicare,
Arends should have called Roberts or a nurse manager with her
question.  (Schiller Aff. ¶ 3.)  The record is unclear as to
whether a RN or nurse manager was present for Arends to consult.
(Compare Schiller Aff. ¶ 3 with Hughes Aff. ¶ 6.)  Moreover, the
record reflects that Arends contacted the other LPNs because of
their seniority, and they saw no reason for Arends to call Roberts
at home.  (Arends Aff. ¶¶ 6-8; Hughes Aff. ¶ 6.)

4

and had no other work to complete, clock out. (Arends Aff. ¶¶ 6-7.) As a result, Arends clocked out at approximately two o'clock in the morning after writing a note for Roberts to call her regarding the assignment and attaching the FAQ with the relevant language highlighted. (Pl. Ex. D; Arends Aff. ¶ 9.)

Arends worked her regularly scheduled night shift on October 5, 2006, and had no contact with Roberts until Roberts called a meeting with Arends and the LPN clinical coordinator at the end of Arends's shift. At that meeting, Roberts presented Arends with a first Absenteeism Notice regarding four occurrences, only one of which had taken place in the three previous months and for which Arends had provided a note from her dentist. (Pl. Exs. J, K.) Arends refused to sign the notice. Roberts also informed Arends that she had written Arends up for failing to administer pain medication to a patient upon request. Arends challenged Roberts's claim. Roberts immediately consulted the records and after determining that Arends had acted appropriately, tore up the disciplinary notice. Nevertheless, Roberts informed Arends that she was terminating Arends's employment and, along with the LPN clinical coordinator, escorted Arends off of the premises as the night shift left and the day shift arrived. Roberts also refused to provide Arends with the phone number for corporate headquarters at that time. (Arends Aff. ¶ 12.) The written Disciplinary Action Report ("DAR") detailing Arends's termination was signed by

Roberts, referenced the March 4 assignment and the FAQ and indicated that Arends was terminated for refusing "to follow a direct order from a supervisor (insubordination)." (Pl. Ex. F.) Also attached to the DAR were copies of the written assignment and the FAQ that Arends had attached to her note to Roberts.

Within hours of her termination, Arends called an Extendicare hotline and contacted the Board of Nursing and Minnesota Department of Health to complain about her termination. (Pl. Ex. G; Arends Dep. at 84-85; Arends Aff. ¶ 13.) That same day, Arends had a friend hand deliver a written request for her final paycheck. (Pl. Ex. N; Arends Dep. at 85-86.) After receiving no response, Arends faxed another request to Extendicare on October 10, 2006. Arends received and deposited her paycheck that day, and the check cleared three days later.

Arends filed a complaint in state court on January 18, 2007, and an amended complaint on January 29, 2007, alleging violation of the Minnesota Whistleblower Act (the "Act"), violation of Minnesota Statutes §§ 181.13 and 181.171, and claims for wrongful discharge and "breach of contract/promissory estoppel." Extendicare removed the action to federal court on February 8, 2007, and filed an amended answer and breach of contract counterclaim on February 19,

2007.  On October 2, 2007, Extendicare moved for summary judgment on all claims.[4]

## DISCUSSION

### I.   Summary Judgment Motion

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party.  See id. at 255.  The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth

---

[4] At the January 11, 2008, oral argument on Extendicare's motion, the court requested letter briefing with respect to the amount in controversy for purposes of diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).  Based upon the parties' filings, the court is satisfied that federal jurisdiction is proper.  (See Doc. Nos. 62, 63.)

specific facts sufficient to raise a genuine issue for trial.  See
Celotex, 477 U.S. at 324.  Moreover, if a plaintiff cannot support
each essential element of its claim, summary judgment must be
granted because a complete failure of proof regarding an essential
element necessarily renders all other facts immaterial.  Id.

**A.   Minnesota Whistleblower's Act**

Arends claims that Extendicare violated the Act by terminating
her employment.  The Act forbids an employer from terminating an
employee because:

> (a) the employee, ... in good faith, reports a
> violation or suspected violation of any
> federal or state law or rule adopted pursuant
> to law to an employer or to any governmental
> body or law enforcement official;
>
> . . .
>
> (c) the employee refuses an employer's order
> to perform an action that the employee has an
> objective basis in fact to believe violates
> any state or federal law or rule or regulation
> adopted pursuant to law, and the employee
> informs the employer that the order is being
> refused for that reason;
>
> (d) the employee, in good faith, reports a
> situation in which the quality of health care
> services provided by a health care facility,
> organization, or health care provider violates
> a standard established by federal or state law
> or a professionally recognized national
> clinical or ethical standard and potentially
> places the public at risk of harm.

Minn. Stat. § 181.932, subdiv. 1.

The court analyzes a claim under the Act pursuant to the
burden-shifting framework set forth in McDonnell Douglas Corp. v.

<u>Green</u>, 411 U.S. 792 (1973).  Under <u>McDonnell Douglas</u>, an employee must make a prima facie showing that (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action and (3) there is a causal connection between the two.  See <u>Eliserio v. United Steelworkers of Am. Local 310</u>, 398 F.3d 1071, 1078-79 (8th Cir. 2005); <u>Cokley v. City of Otsego</u>, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001).  If an employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for the employee's termination. <u>Buytendorp v. Extendicare Health Servs., Inc.</u>, 498 F.3d 826, 834 (8th Cir. 2007).  The employee must then rebut the employer's proffered reason by showing that it is pretext for unlawful retaliation.  <u>Id.</u>

### 1.  Good Faith Report

To establish a prima facie case under subsections (a) and (d) of the Act an employee must show that she made a good faith report. To "report" means to "make or present an often official, formal or regular account of," or "to relate or tell about; present." <u>Janklow v. Minn. Bd. of Exam'rs for Nursing Home Adm'rs</u>, 536 N.W.2d 20, 23 (Minn. App. 1995), <u>aff'd</u>, 552 N.W.2d 711 (Minn. 1996).  A good faith report is a report made for the purpose of exposing an illegality.  <u>Skare v. Extendicare Health Servs., Inc.</u>, 515 F.3d 836, 841 (8th Cir. 2008) (citing <u>Obst v. Microtron, Inc.</u>, 614 N.W.2d 196, 202 (Minn. 2000)).  A court considers the employee's

"'purpose at the time the report[] w[as] made, not after subsequent events have transpired.'"  Gee v. Minn. State Colleges & Univs., 700 N.W.2d 548, 555-56 (Minn. Ct. App. 2005) (quoting Obst, 614 N.W.2d at 202).  Whether an employee "made a report in 'good faith' is a question of fact, but [a] court may determine as a matter of law that certain conduct does not constitute a 'report.'" Borgersen v. Cardiovascular Sys., 729 N.W.2d 619, 624 (Minn. Ct. App. 2007) (citation and quotation omitted).

In this case, there is no evidence that Arends intended to expose an illegality at the time she left the note for Roberts. Rather, the record establishes that Arends only sought clarification of the written instructions because she did not think that Roberts would ask her to do something illegal.  (See Arends Dep. at 61.)  Because Arends did not leave the note for the purpose of exposing an illegality, she did not make a statutorily protected report and cannot establish a prima facie case under subsections (a) and (d) of the Act.  Accordingly, summary judgment on those claims is warranted.

2.    **Refusal to Perform Illegal Order**[5]

Subsection (c) of the Act protects from retaliation an employee who (1) received an order from her employer, (2) refused to perform the order, (3) had an "objective basis in fact" to believe that the order violated the law and (4) informed the employer that her reason for refusing the order was her belief in its illegality.  Minn. Stat. § 181.932, subdiv. 1(c); see also Gundacker v. Unisys Corp., 151 F.3d 842, 846-847 (8th Cir. 1998); Grundtner v. Univ. of Minn., 730 N.W.2d 323, 329 (Minn. Ct. App. 2007).

First, Extendicare argues that Roberts did not order Arends to complete assessments and care plans but rather merely "asked if she wished to come in on a shift to work on th[e] paperwork."  (Def.

_____

[5] Arends asserts claims under subsection (c) of the Act and the common law.  Shortly before passage of the Act, the Minnesota Court of Appeals recognized a cause of action protecting employees from being terminated in violation of a "clear mandate of public policy."  Phipps v. Clark Oil & Ref. Corp., 396 N.W.2d 588, 592 (Minn. Ct. App. 1986).  After passage of the Act, the Minnesota Supreme Court adopted the Act's definition and held that under the common law "an employee may bring an action for wrongful discharge if that employee is discharged for refusing to participate in an activity that the employee, in good faith, believes violates any state or federal law or rule or regulation adopted pursuant to law."  Phipps v. Clark Oil & Ref. Corp., 408 N.W.2d 569, 571 (Minn. 1987).  However, "the Phipps cause of action is not merely a pre-Whistleblower Act cause of action, but a cause of action with continuing viability in the common law."  Nelson v. Product Alternatives, 715 N.W.2d 452, 455 (Minn. 2006).  Nevertheless, in this case, because Arends's common law wrongful discharge claim is "largely duplicative of the cause of action under the Whistleblower Act," the court's analysis applies equally to both.  Id. at 455 n.3.

Br. at 28.)  Once Arends agreed to work, however, Roberts expressly ordered her in writing to review each chart and "complete assessments and care plans." (Pl. Ex. B.)  Thus, Extendicare's argument fails.

Second, Extendicare argues that Arends did not refuse to perform Roberts's order but merely sought clarification.  The record, however, indicates that although Arends sought clarification of the written order, she also refused to perform the order as she understood it.  Indeed, Arends was terminated for her "refusal to follow a direct order from a supervisor." (Pl. Ex. F. (emphasis added)).

Third, Extendicare argues that Arends did not have an "objective basis in fact" to believe the order violated the law. In support of its argument, Extendicare refers to other documents completed by Arends and other LPNs that are the same or similar to those Roberts ordered her to complete.  Moreover, Extendicare contends that Arends knew of and understood the contents of the FAQ through her schooling and previous employment, and therefore her claim that she discovered the alleged illegality of the order when Kracklew gave her the FAQ is unbelievable.  The present conflict, however, appears to stem from confusion over the actual breadth of Arends's order and the laws governing a LPN's scope of practice. Over the phone, Roberts indicated that Arends was only to review charts and complete paperwork.  The written instructions, however,

expressly ordered Arends to complete assessments and care plans. If literally understood, these instructions would have contravened the FAQ's express admonition that the "assessment, care planning, and evaluating functions lie within the RN definition and scope of practice." (Pl. Ex. E.) After Kracklew reminded Arends of the FAQ, Arends contacted two senior LPNs who agreed that Roberts's written order exceeded a LPN's scope of practice. Nevertheless, Extendicare claims that no reasonable jury could conclude that Arends believed that Roberts would ask her to engage in illegal conduct given the imminency of the Minnesota Department of Health's surprise inspection and Roberts's knowledge and understanding of the FAQ. However, in light of the contents of the FAQ, Arends's alleged understanding of Roberts's order and the response of the two senior LPNs, the court determines that a genuine issue of fact exists as to whether Arends had an objective basis in fact to believe the order violated the law.

Finally, Extendicare argues that Arends did not inform Roberts that her reason for refusing the order was because Arends believed it to be illegal. Arends, however, attached a copy of the FAQ highlighting the language she thought established the illegality of Roberts's order. The court determines that this is sufficient to create a genuine issue of fact as to whether Arends informed Roberts that she refused to complete the assignment because she believed it to be illegal. Thus, viewing all evidence and

13

inferences in a light most favorable to Arends, the court determines that a reasonable jury could conclude that Arends engaged in statutorily protected activity.

Extendicare concedes that Arends suffered an adverse employment action by being terminated but maintains that she was not terminated because of her alleged statutorily protected activity. Specifically, Extendicare argues that Arends was terminated for walking off of the job without contacting management and that the temporal proximity between Arends's alleged protected activity and her termination does not create a genuine issue of fact as to causation. Extendicare's argument, however, ignores the unequivocal language in the DAR that Arends was terminated for refusing to follow Roberts's order. Thus, whether Roberts terminated Arends for refusing to complete the assessments and care plans or for leaving before completing her shift is a disputed factual issue appropriately left for a jury to resolve. Therefore, the court determines that Arends has established a prima facie case of unlawful retaliation.

To satisfy its burden of articulating a legitimate, nonretaliatory reason for Arends's termination, Extendicare claims that Arends cannot show that Roberts "was anything other than upset that [Arends] had not completed an assignment that she was asked to do, that she agreed to do, that she did not do, of which she avoided completing even the noncontroversial portion, while walking

off the job without notifying any management." (Def. Br. at 26-27.)  In substance, Extendicare reiterates its argument that Arends's conduct did not constitute statutorily protected activity and thus her termination was nonretaliatory.  However, because a genuine issue of fact exists as to whether Arends engaged in statutorily protected conduct, the court determines that Extendicare has not stated a legitimate, non-retaliatory reason for terminating Arends.  Therefore, the court denies summary judgment on Arends's wrongful discharge claims under subsection (c) of the Act and the common law.

**B.  Breach of Contract and Counterclaim**

Arends maintains that at the time she was hired, Extendicare promised her a $5,000 "sign on bonus" after completion of a ninety day probationary period.  However, the only evidence in the record pertaining to a bonus is the Bonus Agreement, the express terms of which provide for incremental payments.[6]  See Hous. & Redev. Auth. of Chisholm v. Norman, 696 N.W.2d 329, 337 (Minn. 2005) (extrinsic evidence examined only if contract ambiguous).  Thus, the issue is whether Arends is entitled to the final $2,000 under the Bonus Agreement.

---

[6] To support her argument, Arends cites pages 178 to 181 of her deposition and to exhibit two of the Thorman Affidavit. However, the exhibit is merely a copy of the Bonus Agreement and Extendicare's payment history under that agreement, and the materials submitted by the parties do not include pages 178 to 181 of Arends's deposition.

"The cardinal purpose of construing a contract is to give effect to the intention of the parties as expressed in the language they used in drafting the whole contract." Art Goebel, Inc. v. N. Suburban Agencies, 567 N.W.2d 511, 515 (Minn. 1997). Construction of an unambiguous contract is a legal question for the court, while construction of an ambiguous contract is a factual question for the jury. See Denelsbeck v. Wells Fargo & Co., 666 N.W.2d 339, 346 (Minn. 2003) (citations omitted). Whether a contract is ambiguous is a question of law for a court to decide. Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp., 279 N.W.2d 349, 354 (Minn. 1979) (citations omitted). "A contract is ambiguous if, based upon its language alone, it is reasonably susceptible to more than one interpretation." Art Goebel, Inc., 567 N.W.2d at 515 (citation omitted). However, "[w]here the parties express their intent in unambiguous words, those words are to be given their plain and ordinary meaning." Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc., 666 N.W.2d 320, 323 (Minn. 2003) (citation omitted).

The Bonus Agreement provides that "[u]pon hire [the employee is] eligible for a Retention Bonus in the amount of $5,000" to be paid in four installments over the course of a year, subject to certain conditions. Further, the Bonus Agreement contemplates an employee voluntarily leaving the company or being terminated for just cause and requires repayment of paid bonuses upon the occurrence of either. However, the Bonus Agreement is silent as to

16

whether an employee is entitled to full payment if she is terminated without just cause. Therefore, the court determines that the Bonus Agreement is ambiguous as to whether Arends is entitled to the remaining bonus payments if Extendicare terminated her without just cause, and the issue is one for jury resolution.

Extendicare, however, contends in support of its counterclaim that it terminated Arends for just cause and is thus entitled to repayment of the already remitted $3,000. Just cause "generally means a real cause or basis for dismissal as distinguished from an arbitrary whim or caprice." See Hilligoss v. Cargill, Inc., 649 N.W.2d 142, 146, 148 (Minn. 2002). In other words, just cause is "some cause or ground that a reasonable employer, acting in good faith in similar circumstances would regard as a good and sufficient basis for terminating the services of an employee." Id. In consideration of the factual disputes addressed above with respect to Arends's wrongful discharge claims, the court determines that whether Arends was terminated for just cause is an issue of fact reserved for the jury. Therefore, the court denies summary judgment on Arends's breach of contract claim and Extendicare's counterclaim.[7]

---

[7] In her amended complaint, Arends contends that her Employee Handbook from Extendicare created an employment contract requiring progressive discipline and requiring employees to report non-compliant activity. (Am. Compl. ¶¶ 31, 32.) The court, however, does not consider those arguments because Arends has not pursued them. Moreover, even if Arends had pursued those arguments, the
(continued...)

C.   Payment of Earned Wages

Arends argues that Extendicare was in default under Minnesota Statutes § 181.13(a) by not paying her wages after her termination and within twenty-four hours of her demand for payment.   Section 181.13 provides that an employer is in default if a terminated employee's earned wages are not paid within twenty-four hours of demand for payment.   The statute further permits recovery by the employee of "average daily earnings at the rate agreed upon in the contract of employment," for each day, up to fifteen, in which the employer is in default.   Minn. Stat. § 181.13(a); <u>see also</u> Minn. Stat. § 181.171 (providing individual cause of action and damages for violation of § 181.13).

Extendicare does not contest that Arends demanded payment on October 6, 2006, but was not paid until a later demand on October 10, 2006.   Therefore, the court denies summary judgment with respect to those unpaid wages.   Arends further argues, however, that the $2,000 in unpaid bonus payments constitute "wages or commissions actually earned," and that Extendicare improperly withheld those payments.   Minn. Stat. § 181.13(a).   An earned bonus constitutes "wages" under section 181.13.   <u>Kvidera v. Rotation</u>

[7](...continued)
record contains no facts suggesting that the Employee Handbook created an employment contract.   <u>See</u> <u>Audette v. Ne. State Bank</u>, 436 N.W.2d 125, 126 (Minn. Ct. App. 1989) ("Whether a handbook can become part of the employment contract raises such issues of contract formation as offer and acceptance and consideration." (citation and quotation omitted)).

Engineering & Mfg. Co., 705 N.W.2d 416, 423 (Minn. Ct. App. 2005).
As discussed above, however, an issue of fact remains as to whether
Arends is entitled to the remaining $2,000 so that Extendicare
would be in default for refusing payment.   Therefore, the court
also denies summary judgment on this claim with respect to the
unpaid bonus payments.[8]

## II.   Objections to Magistrate Judge Order

Arends appeals Magistrate Judge Susan Nelson's December 7,
2007, order, denying Arends's motion for leave to add a claim for
punitive damages.   A district court reviews a magistrate judge's
order with respect to a nondispositive motion under an "extremely
deferential" clearly erroneous or contrary to law standard.   See
Reko v. Creative Promotions, Inc. 70 F. Supp. 1005, 1007 (D. Minn.
1999); 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); D. Minn.
L.R. 72.2(a).

Under Minnesota law, a plaintiff may not assert punitive
damages in her complaint but must instead later move to amend the
pleadings to claim punitive damages.   Minn. Stat. § 549.191.   A
court will grant the motion if it finds prima facie evidence of an
entitlement to punitive damages.   Id.   In this context, the term
prima facie "does not refer to a quantum of evidence, but to a

---

[8] In her complaint, Arends also indicated that Extendicare
never paid her wages from October 5 and 6, 2006.   (Am. Compl.
¶ 28.)   After receiving clarifying documents from Extendicare,
however, Arends concedes that she was paid and withdraws her claim
with respect to those wages.   (Pl. Br. at 41.)

procedure for screening out unmeritorious claims for punitive damages." Thompson v. Hughart, 664 N.W.2d 372, 377 (Minn. Ct. App. 2003) (citation and quotation omitted). In reviewing the evidence, a court "makes no credibility rulings, and does not consider any challenge, by cross-examination or otherwise, to the plaintiff's proof." Berczyk v. Emerson Tool Co., 291 F. Supp. 2d 1004, 1008 n.3 (D. Minn. 2003) (citation omitted).

Minnesota Statutes § 549.20 provides the applicable standard for entitlement to punitive damages:

> (a) Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others.
>
> (b) A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:
>
>> (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or
>>
>> (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

Because Arends asserts punitive damages based upon Roberts's alleged actions, the magistrate judge focused on Roberts's state of mind to determine whether Roberts acted with deliberate disregard

for the rights of Arends or others.  (Mag. Order at 5.)  Due to the confusion over the scope of duties of LPNs and RNs and the breadth of Roberts's order, the magistrate judge concluded that "Arends' superiors might have suffered from ignorance or confusion, but they did not 'deliberately disregard' the rights or safety of others so as to warrant a claim for punitive damages."  (Mag. Order at 11.) Arends argues that the magistrate judge's order is clearly erroneous or contrary to law because it confuses Roberts's state of mind in issuing the order with her state of mind in terminating Arends.  (Pl. Obj. at 2.)  Specifically, Arends claims that she "has produced prima facie evidence that at the time of termination, [Roberts] knew that [Arends] had a reasonable and good faith belief that the assignment violated the [law]."  (<u>Id.</u>)

Arends's argument assumes that she has established the possession of a right that Roberts deliberately disregarded.  As noted above, a question of fact remains as to whether Arends had a right to be free from termination for refusing to perform Roberts's order.  The magistrate judge was correct, however, that "this presents a different question from the propriety of punitive damages," which require clear and convincing evidence of a right's existence.  (Mag. Order at 6 n.4.)  Moreover, although a fact issue remains as to whether Arends had an objective basis to believe that Roberts's order violated the law, in light of the considerations discussed above regarding that issue, the court determines that

Arends has not presented prima facie evidence establishing a right under the Act that satisfies the heightened clear and convincing standard.  See Morrow v. Air Methods, Inc., 884 F. Supp. 1353, 1358-59 (D. Minn. 1995) (claim under Act survives summary judgment but punitive damages not allowed).  Accordingly, the court affirms the magistrate judge's order because it is neither clearly erroneous nor contrary to law.

### CONCLUSION

Based upon the above, **IT IS HEREBY ORDERED** that:

1.   Defendant's motion for summary judgment [Doc. No. 40] is granted in part and denied in part.

2.   The order of the United States Magistrate Judge dated December 7, 2007, [Doc. No. 47] is affirmed.

Dated:  April 10, 2008

s/David S. Doty
David S. Doty, Judge
United States District Court

22